Good morning, Your Honors. I'm John Taylor for the Plaintiff and Appellant on Richard Meyer. In 1986, Shoei Denko started making an over-the-counter protein supplement, amino acid supplement called L-tryptophan, which was sold here in the United States and around the world. In 1988 and 1989, contaminated L-tryptophan made its way into the United States and beginning in... Could you speak up a little? I apologize. In 1989, 1988, contaminated L-tryptophan found its way into the United States, was ingested by people, and people developed a very unique thumbprint, fingerprinted ID type of illness called eosinophilia myalgia syndrome. Did your client take that product? Yes, sir. How do we know that? In his deposition, he testified, and in his answers in interrogatories, that during the time period in which he was concerned about his health, that he took a number of L-tryptophan-containing products, otherwise referred to as LTCPs, which were amino acid boxes of like Joe Weider's Body Builder and or products that were sold at the GNC store. Did he take the products sold by this defendant? The tracing evidence is that products that were sold at GNC during this time period that contained listed L-tryptophan... You're trying to skate around what I think is the obvious problem. It doesn't seem your client can tell us that he took this stuff that he's suing about. No, he says I took, and specifically in the court record at 156, which is his deposition testimony, he says I bought a box, I looked on the back, it says, and I listed the L-amino acids including L-tryptophan. Whose box was it? He does not know that. That's the point. Is that a problem in your case? No. It traces back during that time period through the tracing documents that were provided by the defendants and by GNC and through the motor district litigation, you could trace back during time frames that the only product that was then incorporated into products that were sold by various retailers were made by the defendant. Well, it's a problem in your case if Dr. Gleich is disqualified as an expert. So your problem here is to persuade us that Dr. Gleich should not have been disqualified. If we accept his testimony, I guess here in the form of affidavit, then you've got some argument as to why he took something that contained L-tryptophan manufactured by the defendant. That's correct. And when you looked at, I mean, I looked at the two affidavits, Dr. Gleich and Dr. Montanaro, and although I think that Dr. Gleich is eminently more qualified, I think that setting that aside, if you read through the two declarations, they both say essentially the same thing. Now, Dr. Gleich, mind you, was the doctor at the Mayo Clinic who received the first reports of the three cases in New Mexico. He is the one that alerted the CDC, the Center for Disease Control. Well, what killed you in the district court was a single sentence. It was the last sentence in paragraph number 9, the sentence in which Dr. — is it Gleich rather than Gleich? Gleich. In which Dr. Gleich writes, The fact that he has EMS and that Showa Denko contained L-tryptophan has been shown to be the only cause of this condition establishes to a reasonable medical certainty. The district court says, well, it's not the only cause of this condition because we know that at least in certain circumstances, somewhat rare, this disease is caused independently of contaminated L-tryptophan. That is correct. And I know that's what the district court went, you know, the district court respectively went off on. But, I mean, the papers that Dr. Gleich respectively, that he refers to, the first group study, the first four major studies that came out, Dr. Gleich co-authored those studies in which they would say that there are, the very first study is Schweiger, which says in 1990, we're looking at approximately 1,500 and some odd cases and about 46 of those, we don't know what the cause of the EMS is. That's less than 4%, less than 3, or about approximately 3%. So Dr. Gleich then, the epidemiology ceases in approximately 1992. There's no study. So Dr. Montanaro says, I've looked at the medical records, and the same thing that Dr. Gleich says. I looked at the literature. It's my opinion the gentleman has eosinophil fasciitis as opposed to EMS. Dr. Gleich says, I've looked at the literature. I'm the one who wrote these documents. I review the same medical records as Dr. Montanaro, and I think it's EMS. So, to me, it's dueling experts. The question, the problem is the district court focused on this one sentence where Dr. Gleich says, the only cause, the only known cause is this cause, the product manufactured by this defendant. That's what he says. That's correct. Okay. So these studies show there are some people with the disease who they don't, they say they never took the product. Well, I suppose he could say about those four studies he could have explained that, you know, we discount that, we don't believe them because blah, blah. But I thought there was other evidence that was undisputed that this disease existed out there in the world before this product came on the market. There is in a number of the studies which were done during the time frame, which is really about 1990 to 1992, that there are EMS cases that are possibly, that's the best it gets, are possibly caused by some other unknown condition. They cannot explain those confounding factors. Dr. Gleich's opinion in 2003 is that, in his opinion, that the only way that you can get EMS is from having taken this contaminated product. And so where I felt the district court overstepped its bounds and where it abused its discretion was that this should be something for the trial court. Dr. Gleich testified and has held this opinion, testified in 1996. There have been three trials in the United States. So it's your view that it is not accepted in the scientific community that there are other causes of EMS? I think that there is, I think that there are papers that were written by, say, Dr. Spitzer, who was paid for by Showa Denko and has to credit in the paper that it is from an unconditional grant from Showa Denko who found errant EMS cases. It behooved them during the 5,000 or so pending lawsuits that they resolved, except for three around the United States, to generate peer-reviewed literature which would indicate that EMS could not come solely from the product. The overwhelming opinion and the mainstream opinion, even in the articles that are cited by the defendants, is that the strongest tie, the overwhelming tie, to this illness is the consumption of this product. Dr. Gleich's opinion is it's the only cause. And that is, so there's a disagreement. That's a material issue of fact. That is not something that is so outside the mainstream of the literature. First off, the literature stopped. And that's what everybody, I mean, seems to think that this is an ongoing study. The epidemic happens. There's 1,500 people that are ever looked at, or by the CDC, not looked at, but were quantified. But then the literature essentially stops by 19, it dribbles off by 1992. There's articles of 1996. But as late as 1996, 2001, the Kilbourn study at page 447 of the court's record, conclude, epidemic, L-tryptophan, Showa Denko's L-tryptophan, EMS, that is the only cause. Although there are aberrant cases which we cannot either anecdotally, you know, a gentleman in Scotland, two people in Canada, 30 people over here, where we cannot or trace back to them L-tryptophan consumption. Like Mr. Meyer, who says, I didn't take a standalone L-tryptophan product. There's, you know, the bottles of like B-complex stuff, and there's L-tryptophan bottles. There was not, L-tryptophan was also contained in, you know, supplements that were bottled and sold as a whole. And although everybody agrees it is dose responsive, there is also the agreement that there were people who died as a result of taking as few as three pills. There were people who obviously ate mountains of this stuff and lived. But all we know is that when it was taken off in 1989, November of 1989, we know that the people have, the illnesses stopped. And what happened was the literature stopped. And during the last trial in 1996, which Mr. English and I both participated in, the same argument that we're having with you, respectfully, or disagreement, was, you know, they tug the literature one way and say, well, look at that. What about all these cases out here? And, you know, our epidemiologists would say, no, they're flawed for this reason. And, you know, Dr. Gleick's opinion was, and still is at this time, my opinion is that the only cause and the only way you can get this is from taking this particular product. That's my opinion. And it's not bootstrapping Judge Trott. I don't believe it's a bootstrapping argument to say that, you know, he's got the illness, therefore he has that. But it's also like the asbestos cases. It's like mesothelioma. If somebody says he works in a shipyard and he gets mesothelioma, it is such a unique illness, it can only come from exposure to asbestos. Okay. Your time has run. Let's hear from the other side and we'll give you a chance to rebut. Thank you very much. May it please the Court. My name is Jerome English. I'm with Pillsbury Winthrop Shaw Pittman. We're a counsel for appellees. As this Court has mentioned once before in the Darber case, something doesn't become scientific just because it is uttered by a scientist. It is well settled. Can you explain to me, it seemed to me that what Dr. Gleich was saying is, look, there are these people who deny they've taken this. I really don't believe them. There's only a few of these cases. The overwhelming evidence is this is the only cause. That's what I seem to think that he is saying. So it seems to me to throw him out because of the way he phrased that sentence, his statement has to be proven to be total junk. And so what is the evidence that is so overwhelmingly accepted in the scientific community that this is not the only cause? And to answer that question, Your Honor, I need to step back for the moment. It was thrown out not because we were trying to diagnose whether or not Mr. Meyer had EMS. The question we were trying to answer, the trial court was trying to answer, and what that declaration was going to was whether or not he ate Showa Denko's product. And so in order to determine whether or not he ate the product, Dr. Gleich was taking the position that the only thing that could  be proven to be true was that he ate Showa Denko's product. Now, the studies showed, and not just the Swigert study that he relied upon that had a 3% error rate and therefore about 45 cases of non-L-tryptophan related EMS. But the other study that he had relied upon, Dr. Sluster's study, had a case of an EMS patient eight years prior to the epidemic, at least two years prior to the time that Showa Denko began manufacturing L-tryptophan. The fact of the matter was, there have been EMS cases prior to the time that Showa Denko manufactured L-tryptophan. There have been EMS cases since L-tryptophan has been taken off the market. Not only that, reports not from individuals paid by Showa Denko, the Food and Drug Administration in its own report in 1996 had stated that L-5-half-droxyl-tryptophan, which is not a manufactured product by Showa Denko, appears to cause a EMS, and that they are still tracking additional EMS cases. And let's understand what EMS is. This is a syndrome. It's not a specific disease. This is not like mesothelioma. EMS is a syndrome, high eosinophils, myalgia, debilitating myalgias, and an unknown explanation. There was a high incidence of it during a small time period in 1998 and 2000, excuse me, 1980. Is this a difficult disease to diagnose? Difficult in this regard only, Your Honor. If you meet what has been called the CDC criteria, if you have the high eosinophils and the myalgia during that, and the unexplained, that met the CDC criteria for eosinophilia myalgia syndrome, and it was diagnosed as such. One of the things that then would assist in that diagnosis was whether or not the party also took L-tryptophan. But there have been similar types of illnesses, exactly the same type of illnesses in people who did not take L-tryptophan. It is an autoimmune disease that something triggers. Something triggered this particular instance, but something else can trigger it as well. And the issue here is, what triggered Richard Myers' disease some four or five years after he stopped taking protein products? Yeah, and apparently it's well established in the literature that the contaminated L-tryptophan can indeed cause this syndrome. After a hiatus. You don't dispute that, do you? Only a short hiatus. As a matter of fact, the literature that Dr. Gleich had relied upon, the longest time period was one year after cessation. Not four years after cessation. As a matter of fact, the original expert that they had designated, Dr. Carstens, who has treated a number of EMS patients, testified he had never seen a case of a four-year latency period between the time of stopping of the consumption of L-tryptophan. Never seen a case or never heard of a case? Had never heard of a case, nor treated one, either of those. He had not had one himself, nor had he read one in the literature. That if Meyer is a case of a four-year latency period, it is unique. Let me ask, you said that this evidence came in just to establish that he took it. The plaintiff's counsel said that there were tracings. You could trace the product so that GNC, where he bought the stuff he took, only got your defendant's product. Nobody else. There is no evidence in this case, Your Honor, as to what product was in that GNC store. None whatsoever. So you say there is no tracing of product. There is no tracing evidence in this case on that product. The sole evidence that this court had, and the sole evidence that the trial court had to rely upon in the time to determine whether or not this individual ate the product, was Dr. Gleick's statement that only Shobodanko's product could have caused this illness, and therefore, he must have eaten the product. I have to say, my problem with your position is not that you're necessarily wrong. But that in order to disqualify an expert under Daubert, the technical term, I believe, is that used by Judge Rustami, that is to say it has to be junk. It has to make a, the method that he used has to have caused him to make an analytical leap, too great of a gap. And here was the issue here. Dr. Gleick had to determine that the sole cause of this man's illness was the consumption of L-tryptophan. Now, why do you say he had to determine that? He seems to have if we read that sentence literally and not in context of the rest of the affidavit. But why did he have to say that? If he did not, Your Honor, if he was now going to talk about the probabilities, we would have had a probability analysis. We don't have that either. What do you mean we would have had a probability analysis? In order to do the methodology now, to suggest that it was more probable than not that Mr. Meyer ate Showa Denko's product, we now have to find out the probability of him having that product, of the likelihood that this product could have caused this illness in this individual until four years later. We don't have, there is no analysis here. It is simply a flat statement that Showa Denko's product causes EMS, Meyer has EMS, therefore he ate the product. That is all that we have in support of his contention that he ate Showa Denko's product. And again, the issue here was not that he had EMS. The issue was solely did he eat the product. And the burden of proof, of course, is preponderance of the evidence? Yes. Did anybody ever question Dr. Gleich about these cases in places that existed, in places where the product was never sold, in places where before the product came on the market? Was he asked about those? No, he wasn't. Procedurally here, the plaintiff's appellants had designated originally Dr. Carstens as their expert witness. And Dr. Carstens was deposed at length on the basis of his opinion. In opposition then to our motion for summary judgment, they dropped Dr. Carstens and filed this declaration from Dr. Gleich. Dr. Gleich made a simple flat statement that is appeared in paragraph nine of his declaration, that the only cause of this is eating our product. And he fails to differentiate or even explain the cases that he cited himself in his own paper that do not hold that position. And your view is that an exaggeration is enough to disqualify him as an expert? Not an exaggeration. The question is, in rebutting our motion for summary judgment and trying to establish, did he eat the product? Dr. Gleich has taken the position as a scientist that I can state, yes he did, solely because he has the illness. And what the trial court here is saying is, okay, where is the support for that? And the studies that he relied upon do not support that contention. In fact, there are other causes for EMS which Dr. Gleich did not explain. He made too great of an analytical leap between those studies to now conclude it is the sole cause, and therefore you can find, asking the trial court to find that he must have eaten the product. What's the standard of review that we apply to the district court's judgment in this case? Abuse of discretion, Your Honor. The trial court has the burden or the gatekeeper's role of determining the admissibility of evidence. They are given wide latitude in making that determination as to how to do so, as well as that latitude in determining whether or not it has been satisfied. And that is reviewed on an abuse of discretion. Thank you. Okay, thank you very much. You ran up to your time, but we'll give you a minute. Thank you. Judge Rossani, you asked about the procedure. Procedurally, there was only one deposition taken, and that was of Dr. Carstens. Dr. Black was never deposed in this case, and they filed the motion for summary judgment. And Judge Fletcher, you asked whether or not it was difficult to diagnose. The hallmark, the fingerprint, was the elevated eosinophil count at the time that the patient was tested, and that only lasted for a brief window of time. Most people who were diagnosed with the illness, if they did not have blood counts and or tissue samples which indicated a high eosinophil count, it disappeared because it spiked and it went away. And so when they would look at people downstream, it was very difficult to make these diagnoses. And what the defendants have successfully done in the trial court, and in their brief again, is attaching this overwhelming body of evidence in which they've talked about eosinophilia myalgia syndrome, which it was, which is a collection of various complaints. The complaints and the syndrome nature and the language of the various studies that they talk about. Do you want to wrap it up? Yes. The EMS was, or the findings of EMS was consistent. The complaints were consistent with EMS as opposed to actual EMS itself. I have one more question. The other side says if you take a look at the evidence in the record, you'll find that there was no tracing of their product to the store in question. There is the tracing in the record in this case was exactly what I have said so far. Are there the tracing documents that are in the possession of the defendant? No. You're simply operating on the assumption that because he had it, he must have taken it, therefore it was in the store. No. The GNC conceded that they sold that product. And what happened procedurally, just please for a minute, so long as Judge Trott has a question, you can take as long as you need to answer it. Procedurally, Judge, what happened here was the case was pending with multidistrict litigation. It's consolidated, and it gets sent back to Judge Ray. And then between the plaintiff and defendant, it was agreed that two things. Mr. Meyer, by way of a tissue biopsy, which was absolutely definitive, four years afterwards was diagnosed as having EMS, so there's no dispute about that. The defendants agree, it's been proved in court now three times, and for the purpose then of this case, they stipulated the product was defective, in exchange for which, in part, the plaintiffs agreed to waive punitive damages, and the whole case is now going to arbitration. That's where we're headed. And Mr. English and I said, the whole case is causation. It's going to come down to Montanaro versus Gleick. This is the shootout of the O.K. Corral of experts. But we're going to file a motion for summary judgment, and then out comes Daubert. And Daubert doesn't say, you know, stand back and don't let anything in. Daubert says, you cross-examine, you do whatever you've got to do to bring in experts on the case. And so, obviously, it's my burden of proof at the arbitration to prove that Mr. Myers obviously consumed the product, and it isn't a bootstrapping argument. He says, I bought it during this store. The documents that prove that will be there in the courtroom that indicate this is the batches, because it was identified down to batch numbers, where the batches went, how it was encapsulated, what boxes it went into, when GNC had it, what GNC stores had it, and when it was sold during that time period. That's all evidence that will be put on during the arbitration. And so, that gets us to, he took it. Then you have Dr., as Judge Estani says, making this one statement, which is, in my opinion, it's the only way you can get it. There are other people that disagree with him. That's fine. That's the cross-examination. That's the material issue of fact. They abuse their discretion by making the call, and they shouldn't have. They should not have. They should not have. Truly. Thank you, Counsel. Thank you. Okay. The case of Meyer v. Showadenko is submitted for argument. Thank you both for a helpful argument. The next case on the argument calendar is Mosqueda Araujo v. Gonzalez.
judges: Trott, W. Fletcher, Restani